## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

DOLLY GONZALES, Individually and as the )
Personal Representative of the Estate of James )
Dylan Gonzales )
                     )
             Plaintiff, )
                     )     Case No. 12-CV-495-JED-PJC
v. )
                     )
HERB ADSON; CALVIN BROWN; THE CITY )
OF PAWNEE; and PAT LEADING FOX, )
                     )
             Defendants. )

## OPINION AND ORDER

### I.     Background

      This action arises as a result of the death of James Dylan Gonzales, who was shot by

defendant Calvin Brown, a Deputy Police Chief for the City of Pawnee.  After 6:00 p.m. on May

1, 2010, Officer Brown responded to a burglary call upon a report that a witness saw a man carrying

property from an apartment of a resident who was not at home, in the City of Pawnee.[1]  (Doc. 146-

1 at 1; 146-2 at 3).  The report identified as a suspect an "Indian male white shirt blue bandana in

maroon GMC." (Doc. 146-1).  Officer Brown arrived in the area of the report, saw a vehicle

matching that description leaving the apartments and initiated a stop of the vehicle.  Pat Leading

Fox, Jr., the son of defendant Leading Fox, Sr., was driving the vehicle, and Gonzales was a

passenger.  Gonzales exited the vehicle and ran. Officer Brown initially pursued Gonzales, but

then lost sight of him and stopped the chase.  Defendant Pat Leading Fox, Sr., a Pawnee Nation

---

[1]     Officer Brown estimated that he responded to the burglary call at approximately 6:00 p.m.,
while police records reflect that he was dispatched at 6:20 p.m.  (Doc. 127-1; 146-1).  The precise
timing is immaterial to this order.

Officer, subsequently arrived at the scene and was informed by Officer Brown that they should search the abandoned nursing home nearby. A separate domestic disturbance call intervened, and Officers Brown and Leading Fox proceeded to respond to the reported domestic disturbance. Once they completed that call, they traveled to the abandoned nursing home.

Leading Fox and Brown entered the building and split up to simultaneously search opposite sides of the nursing home. Brown has provided evidence that he located Gonzales hiding in a pantry in the kitchen of the nursing home. According to Brown, Gonzales had his right hand hidden under the lower front of his shirt and threatened to shoot Brown. Brown pulled his duty weapon and ordered Gonzales to remove his hand from under this shirt and lay face down on the floor. Gonzales then stood up, removed his right hand from under his shirt, and produced a shiny-looking object. Officer Brown initially believed it might be a gun, and he again ordered Gonzales to get down on the ground. Gonzales then advanced and attacked Brown with the object, cutting Brown's neck and face. Brown then fired his gun to stop the attack. Brown's sworn affidavit states that he was the only officer present when he shot Gonzales, and he maintains that he acted in self-defense to protect himself from Gonzales's attack. The Pawnee County Sheriff's Radio Log Report indicates that a call of shots fired and a request for emergency medical services was made at 7:07 p.m. (Doc. 146-4 at 1). Mr. Gonzales died at the scene.

Pat Leading Fox Sr. provided a sworn affidavit that is consistent with Officer Brown's affidavit. (Doc. 128-1). Leading Fox stated that he heard radio traffic about a burglary call at approximately 6:00 p.m. on May 1, 2010 and he subsequently heard that Brown was stopping a Chevrolet Blazer and was requested to respond to assist Brown. Leading Fox recognized the vehicle description and tag number over the radio as the vehicle driven by his son. Before he arrived, Leading Fox heard Brown over the radio say that a subject had run from the vehicle. After

Leading Fox arrived, Officer Brown indicated they should search the nearby abandoned nursing home. Before they could proceed to the nursing home, they received another call regarding a domestic disturbance, and Leading Fox backed Brown on that call. After they completed that call, they proceeded to the abandoned nursing home. Deputy Larry Miller and dispatcher Dennis Walker were present on the outside of the nursing home when Brown and Leading Fox arrived. Brown instructed Leading Fox to check the rooms on the east side of the nursing home, while Brown checked the rooms on the west side of the building. As Leading Fox searched the reception area, he heard Brown talking to someone. He could not see what was happening because he was not in the same area. A second or two later he then heard approximately three gunshots and began trying to find Brown by heading toward where he heard the sound of gunshots. When Leading Fox found Brown in the kitchen, he also recognized Gonzales and observed that he had an object in his hand. Leading Fox did not witness Brown's shooting of Gonzales and had no interaction with Gonzales prior to the shooting.

The plaintiff has not provided any evidence disputing that provided by Brown and Leading Fox. Instead, in response to the defendants' statements of undisputed facts (which is supported by record evidence), the plaintiff merely lists a number of issues, without evidentiary substantiation. The plaintiff's exhibits are actually consistent with Officer Brown's and Officer Leading Fox's sworn affidavits as to what immediately preceded the shooting of Mr. Gonzales. For example, while plaintiff argues that a question exists as to whether Brown was the only officer who was present and shot Gonzales, she has provided *no evidence* to counter the defendants' evidence that Brown was the only officer in the room when he shot Gonzales. The exhibits plaintiff attaches materially support, rather than refute, the defendant' evidence. (*See* Doc. 146, 147). One of plaintiff's exhibits is a statement by Deputy Larry Miller, in which he indicates that he saw through

a window of the nursing home that Brown entered a room and he then "heard someone tell [Brown] he was going to kill him." (Doc. 146-6). In a statement of defendant Leading Fox, which was submitted by the plaintiff (Doc. 146-7), Leading Fox stated that he and Brown entered the abandoned nursing home building and, as Brown moved into a room on the west side of the building, Leading Fox went toward the reception area. Leading Fox then heard shouting followed by gunshots coming from the area of the room that Brown had entered. When Leading Fox got to the room, he asked Brown "if he was OK" and Brown "said no." (*Id.*). Leading Fox stated that Brown had a scratch on the left side of his cheek, and Leading Fox noticed that Gonzales "had an object in his right hand," which looked like "some kind of glass object." (*Id.*).

Plaintiff also provided a statement of another witness, Dennis Walker, who was a dispatcher and emergency medical technician for the Pawnee Police Department. Walker was at home when he heard Brown informing dispatch on his police radio that Brown was stopping a suspect vehicle on the street near Walker's home. (*See* Doc. 146-8). Walker looked out the front window of his house and saw Officer Brown pulling over a red vehicle. Walker saw an Indian male, wearing a blue bandana, white t-shirt, and blue jeans, exit the passenger side of the vehicle and run from the vehicle. (*Id.* at 3). Walker got in his own vehicle and headed to the 800 block of 9th street to see if he could help locate the man who fled. He knew that there was an old vacant nursing home at that location. (*Id.*). He saw a male at the north end of the nursing home, but lost sight of him when the male ran from the north end of the nursing home to the southwest. (*Id.* at 4). Walker then radioed Brown about seeing the male running in the nursing home. When Brown arrived, he told Walker that Brown and Leading Fox would enter the building to try to locate Gonzales. (*Id.*). A short time later, Walker heard three to five gunshots that sounded as if they came from inside the nursing home. (*Id.*).

After Walker heard the shots, he received a page requesting him to respond to the nursing home. Walker then entered the building and walked to an open room located in the middle area of the nursing home. He observed that Officer Brown was bleeding from the face and neck and that he had cut injuries to his right cheek and lower left neck area. (*Id.* at 4, 6). Walker saw the man who had been shot lying on his back, and he saw that the man "had a clear looking object with a round base gripped in his right hand" and "the end [of the object] came to a point" and "appeared to look like a large syringe in the dark." (*Id.* at 5). At 7:07 p.m., Walker requested that two ambulances be sent to the scene. (*Id.* at 1).

Plaintiff, Dolly Gonzales, who is Mr. Gonzales's mother and the Personal Representative of his Estate, asserts claims under 42 U.S.C. § 1983, based upon alleged violations of the Fourth and Fifth Amendments, and a wrongful death claim under Oklahoma law. The suit was initially brought against numerous defendants. The Court previously dismissed all claims against David Kanuho and plaintiff's official capacity claim against Leading Fox. (Doc. 81). Plaintiff voluntarily dismissed all claims against Larry Miller and Mike Waters. (Doc. 113). Now before the Court are motions for summary judgment filed by the remaining defendants: Herb Adson, Calvin Brown, and the City of Pawnee (Doc. 127); and Pat Leading Fox (Doc. 128).

## II.    Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for a nonmoving party." *Anderson*, 477 U.S. at 248. The courts thus determine "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. All justifiable and reasonable inferences from the evidence are to be drawn in the non-movant's favor. *Id*. at 255.

## III.    Discussion

### A.    Plaintiff Concedes Summary Judgment on Multiple Claims

Plaintiff "concedes the evidence attached hereto does not support any personal participation, exercise of control or direction or a failure to supervise defendants Brown and Leading Fox, Sr. on May 1, 2010 on the part of Defendant Adson." (Doc. 146 at 11). She also admits that she "cannot argue that any action of Adson can be affirmatively linked to the deprivation of the constitutional rights of James Dylan Gonzales." (*Id.*). By those admissions, she has conceded summary judgment is appropriate as to her § 1983 claims against Herb Adson. She also "concedes summary judgment is appropriate for Defendant City of Pawnee, Defendant Adson, Individually and Officially, and Defendant Brown, Officially," and she admits that "there was no notice given in accordance with the Governmental Tort Claims Act." (*Id.* at 15).[2] Accordingly, the Motion for Summary Judgment (Doc. 127) will be granted as to plaintiff's claims (1) against Herb Adson, in both his individual and official capacities, (2) against Calvin Brown in his official capacity, and (3) against the City of Pawnee on the OGTCA claim.

---

[2]    Despite the unequivocal wording of plaintiff's concession regarding the City at page 15 of her brief, it appears that plaintiff intends only to concede summary judgment on her Oklahoma Governmental Tort Claims Act (OGTCA) claim against the City and not her municipal liability claim against the City under § 1983. (*See* Doc. 146 at 9 [arguing for municipal liability against the City under § 1983]).

**B.      Claims Against the Individual Defendants Under § 1983**

Plaintiff asserts that defendants Brown and Leading Fox violated Mr. Gonzales's constitutional rights by using excessive force.

**1.      Calvin Brown**

Officer Brown asserts that he is entitled to qualified immunity. The general summary judgment standards apply to motions for summary judgment based on qualified immunity. Accordingly, courts must still draw the evidence and reasonable inferences in favor of the non-moving party. *See Tolan v.* Cotton, 572 U.S. 650, 656-60 (2014); *Scott v. Harris*, 550 U.S. 372, 377 (2007). In resolving questions of § 1983 qualified immunity at the summary judgment stage, courts engage in a two-pronged inquiry. The first prong "asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right.'" *Tolan*, 572 U.S. at 655-56 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008). The second prong asks "whether the federal right was clearly established at the time of the violation." *Id.* at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). In this Circuit, once qualified immunity is raised by a defendant, the burden shifts to the plaintiff to meet the "heavy two-part burden." *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995); *see also Cox v. Glanz*, 800 F.3d 1231, 1243 (10th Cir. 2015).

Government officials are shielded from liability if their actions did not violate clearly established federal rights "of which a reasonable person would have known." *Tolan*, 572 U.S. at 656 (quoting *Hope*, 536 U.S. at 739). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, __ U.S. __, 138 S. Ct. 1148, 1152 (2018) (quoting *Brosseau v.*

*Haugen*, 543 U.S. 194, 198 (2004)). Courts have discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### a.    First Prong: Violation of a Federal Right

Claims of excessive force in the course of an investigation, arrest, or other "seizure" of a free citizen are analyzed under the Fourth Amendment's reasonableness standard.[3] "When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan*, 572 U.S. at 656; *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). "The inquiry into whether this right was violated requires a balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Tolan*, 572 U.S. at 656 (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) and *Graham*, 490 U.S. at 396). Evaluation of an excessive force claim requires a court to consider whether the "totality of the circumstances" justified a particular use of force. *See Garner*, 471 U.S. at 8-9.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and the inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 396-97 (citations omitted). Determining whether force was reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the

---

[3]    While plaintiff's Second Amended Complaint asserts a claim under the Fifth Amendment, she concedes in her briefing that the analysis in this case is properly conducted under the Fourth Amendment. (*See* Doc. 147 at 13).

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Taking the evidence in the light most favorable to the plaintiff, there are no genuine disputes of material fact that would preclude summary judgment on plaintiff's § 1983 claims against Brown. The evidence relating to Officer Brown's use of deadly force is one-sided. Gonzales matched the description of the man who was seen carrying property out of an apartment and getting into a specified vehicle. When Brown stopped the vehicle, Gonzales exited the vehicle and fled. From the front window of his home, Walker saw a man, wearing a blue bandana, white t-shirt, and blue jeans, exit the passenger side of the vehicle and run from the vehicle. Walker went to the area in his vehicle and subsequently saw the man run from the north end of the nursing home to the southwest, and he radioed Brown to inform him he had seen the man there. After Leading Fox, Sr. arrived at the scene where Gonzales had fled, Brown informed Leading Fox that they should go to the abandoned nursing home to look for him. They were then called to the scene of a reported domestic disturbance. After completing the call, Brown and Leading Fox went to the nursing home. They went in, Brown searched the west areas of the building, and Leading Fox searched the areas on the east side.

Brown stated that he found Gonzales hiding in a pantry in the kitchen area of the nursing home. Gonzales had his hand under the lower front of his shirt, said he had a gun, and threatened to shoot Brown. Brown twice ordered Gonzales to get down on the ground, but Gonzales instead advanced and attacked Brown with an object that he was holding in his hand. Brown felt a sharp object cut him several times in the neck and face. According to Brown's sworn statement, he fired his gun to stop Gonzales's attack. Leading Fox was in the reception area when he heard Brown talking to someone and then heard him fire approximately three gunshots. When Leading Fox

made his way to the kitchen area to find Brown, he saw Gonzales was holding an object in his hand, which Leading Fox thought was "some kind of glass object," and he noticed that Brown's cheek was injured. (*See* Doc. 128-1; 146-7).

The totality of the circumstances establishes that Brown's use of deadly force was not unreasonable. With respect to the *Graham* factor of severity of crime, *see* 490 U.S. at 396, plaintiff asserts that Gonzales had not committed any serious crime. (Doc. 146 at 4, ¶ 15 ["The severity of the alleged crime was non-existent."]). However, in her Second Amended Complaint, she averred that "[t]he allegation of criminal activity which set into motion the events giving rise to this cause of action was; to wit: Burglary in the Second Degree [under *Okla. Stat.* tit. 21, § 1435] – a felony pursuant to the laws of the State of Oklahoma." (Doc. 25 at 4, ¶ 15). Under Oklahoma law, at the time of the incidents involved in this case, second degree burglary was punishable by imprisonment of between two and seven years. *See Okla. Stat.* tit. 21, § 1436 (2017). Gonzales met the description of the reported suspect, and it is undisputed that he ran from the vehicle when it was stopped by police.

Another factor appropriately considered under *Graham* – whether the suspect posed an immediate threat to the safety of officers or others, *see* 490 U.S. at 396 – unmistakably favors Brown in this case. "In assessing the degree of threat the suspect poses to the officers, [courts] consider factors that include, but are not limited to: '(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.'" *Thomson v. Salt Lake County*, 584 F.3d 1304, 1314–15 (10th Cir. 2009) (quoting *Estate of Larsen v. Murr,* 511 F.3d 1255, 1260 (10th Cir. 2008)). Here, there is no dispute that Gonzales attacked Brown with a weapon. Rather

than comply with Brown's commands to show his hand from under his shirt and lay face down on the floor, Gonzales attacked Brown. There was thus no distance separating Brown and Gonzales. The manifest intentions of Gonzales were stated as a threat to kill or shoot Brown and he attacked Brown with a weapon in hand, which cut Brown on the face and neck.

In her Second Amended Complaint, plaintiff alleged that Brown and Leading Fox "falsely claimed that the shooting . . . was justified [because Gonzales] was alleged to have 'stabbed Brown in the face'" and that they "fabricated an attack in offense to falsely justify the excessive force." (*See* Doc. 25 at 7, ¶¶ 31-32). She has provided no evidence to support that assertion. In her summary judgment response, plaintiff identifies as a purported issue "[w]hether Brown alone inflicted the six gunshot wounds noted in the postmortem exam." (Doc. 146 at 5, ¶ 16). But plaintiff has provided no evidence in the summary judgment record that indicates that any person other than Brown fired his weapon, and she does not identify any evidence disputing that Gonzales attacked Brown with a weapon. Plaintiff points to the officers' different estimates of the number of shots fired by Brown, and she cites the post-mortem examination of Mr. Gonzales's body – which identified six gunshot wounds – to suggest that there is an issue of fact as to who fired and how many shots were fired.[4] The plaintiff has provided no evidence that the presence of six gunshot *wounds* is equivalent to six *shots fired*. She did not provide any deposition testimony of any witness or the medical examiner or any expert witness report to establish a methodology for determining how many shots were fired as opposed to the number of wounds located on Gonzales's body during postmortem examination. In the report itself, one of the wounds is identified as a

---

[4]     Brown stated he fired his gun approximately five times. (Doc. 146-13 at 3). Walker "heard what sounded like 3-5 gun shots." (Doc. 146-8 at 1, 4). Leading Fox reported hearing approximately three gunshots. (Doc. 146-7; Doc. 128-1 at 2). Miller indicated that he heard a shot, then two more shots. (Doc. 146-6).

"graze" wound (*see* Doc. 146-5 at 6, 9), and the plaintiff has not offered any evidence to support her speculation that the graze wound was caused by a bullet separate from bullets that caused the other five wounds.

In any event, minor discrepancies in officers' recall of the number of shots fired or heard does not present a *genuine* issue of *material* fact. *See Estate of Larsen*, 511 F.3d at 1261 ("[T]he 'mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'") (citations omitted). Whether Brown fired five times or six times is not material in light of the undisputed evidence that he was attacked by Gonzales, who was wielding a makeshift shank. Brown consistently reported being attacked and feeling cuts to his face and neck. When he entered the building immediately after hearing the shots, Walker saw Brown leaning against a doorway, bleeding from his cheek and with blood on his clothes and hands. (Doc. 146-8 at 1). Larry Miller entered the nursing home after hearing someone threaten to kill Brown followed by gunfire, and he found Brown with a cut on his face. (Doc. 146-6 at 1). Leading Fox reported that, when he entered the kitchen immediately after hearing shots, he saw that Brown's cheek was injured. (*See* Doc. 146-7). The witness statements in the record are also consistent regarding the fact that it was Officer Brown who shot Gonzales. (Doc. 128-1 at 2; Doc. 146-13 at 2-3; Doc. 127-1 at 3, Doc. 147-6). Plaintiff has offered nothing but speculation and conjecture that the witnesses were not truthful on these crucial facts.

The number of shots fired, whether it was five or six, was not unreasonable and does not amount to excessive force in light of the *undisputed fact that Gonzales attacked Brown with a weapon. See Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (if officers are justified in shooting at a suspect to end a severe threat, the officers do not need to stop shooting until the threat has ended).

While the weapon Gonzales used in the attack was not a gun or a knife, it was used to cut Brown on the cheek and neck. "[V]irtually anything can be employed as a weapon, e.g., a pencil can become a dagger." *Shrader v. White*, 761 F.2d 975, 982 (4th Cir. 1985); *see also United States v. Bey*, 667 F.2d 7, 11 (5th Cir. 1982) ("a dangerous weapon is an object capable of doing serious damage to the victim of the assault"); *Garcia v. United States*, 826 F.2d 806, 812 (9th Cir. 1987) (deadly force was reasonable where plaintiff attacked officer with a rock and stick).

Plaintiff further contends that she "has put material facts at issue as to whether . . . probable cause existed to pursue and arrest Gonzales without a warrant and as to whether 'at least reasonable suspicion' existed to pursue and detain" Gonzales. (Doc. 146 at 13). She did not allege any claim of a lack of probable cause to pursue and arrest in her Second Amended Complaint. (*See* Doc. 25). Her theory in summary judgment briefing seems to be that the officers should not have gone to the abandoned nursing home where Gonzales was seen to run and they should not have searched the building to find him. However, as noted, the plaintiff herself acknowledged that Gonzales was suspected of committing a second-degree burglary, a felony under Oklahoma law. (*See* Doc. 25 at 4, ¶ 15).

Moreover, a claim under the Fourth Amendment requires a seizure, and Gonzales was not seized at any time before he was shot by Brown. "A person is seized . . . when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement.'" *Brendlin v. California*, 551 U.S. 249, 254 (2007) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)); *see also Brooks v. Gaenzie*, 614 F.3d 1213, 1224-25 (10th Cir. 2010) (shooting of a fleeing subject was not a "seizure" where it did not stop the subject); *Farrell v. Montoya*, 878 F.3d 933, 937 (10th Cir. 2017) (no seizure until officer has restrained suspect or the officer shows authority and the citizen submits to the assertion of authority).

The evidence is undisputed that Gonzales fled from the scene of an investigatory stop of the vehicle in which he was a passenger. Even if Brown lacked probable cause or reasonable suspicion to stop the vehicle based on the reported burglary, Gonzales was not seized at that point. *See Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. 1994) (noting that "an assertion of authority by the police without submission by the fleeing person does not constitute a seizure") (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). "A seizure is a single act, and not a continuous fact." *Bella*, 24 F.3d at 1256 (citation omitted). The next encounter between Gonzales and Brown occurred during the officers' search of the nursing home. The undisputed record evidence establishes that Gonzales did not surrender to Brown, did not lay face down on the floor as directed, and instead threatened to shoot or kill Brown. Gonzales then advanced at Brown and attacked him with a weapon. Based on the undisputed record evidence, no reasonable jury could conclude that Gonzales submitted to Brown's authority prior to the shooting. Prior to Gonzales' attack on Brown and Brown shooting him, there was no seizure that would support any claim by plaintiff that the officers violated the Fourth Amendment.

Plaintiff also asserts that Gonzales "suffered three wounds which indicate he was kneeling when shot and a wound which certainly appears to be defensive in nature," and asserts that "[i]t is plausible based upon the evidence submitted, a reasonable jury would find Gonzales was a young man chased and cornered in the nursing home without probable cause to arrest by Brown and . . . that he picked up debris from the floor in order to protect himself." (Doc. 146 at 13, 14). To support her claim that he was kneeling, the plaintiff cites the entire Medical Examiner's report. (*See id.*). The Medical Examiner's report does not support plaintiff's attempt to place Gonzales on his knees when he was shot. To the extent that the plaintiff is citing the report's reference to three of the gunshot wounds reflecting a "downward" direction (*see* Doc. 146-5 at 5-6), she has

supplied no evidence that the term means that Gonzales was kneeling at the time of the shooting. Again, she provided no additional information from the medical examiner and no deposition testimony or expert report to support her unsubstantiated construction of that report or her argument that Gonzales was kneeling when he was shot.[5]

In her statement of alleged "Genuine Issues of Material Fact," plaintiff questions "[w]hether the reckless tactics utilized by defendants unreasonably created the need to use deadly force. . . ." (Doc. 146 at 6). She later cites *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997) in asserting a similar argument that Brown created the necessity to use deadly force by cornering the "unstable, dangerous, and unpredictable" Gonzales. (Doc. 146 at 14).[6] In *Allen*, the officers were responding to a report of a suicidal man outside his home, and there were disputes of fact regarding

---

[5]     Elsewhere in her briefing, plaintiff repeats her claim that Gonzales may have been "kneeling" when shot. (*See, e.g.*, Doc. 146 at 5, ¶¶ 17-18; (indicating that Brown reported that he found Gonzales "kneeling" in the pantry]; *id.* at 14). The evidence cited does not support plaintiff's contention. The cited OSBI summary of Brown's statement after the shooting was that Brown located Gonzales "crouched down, hiding inside the pantry closet," after which "Gonzales stood up, removed his right hand front [sic] under his shirt, and produced a shinny [sic] looking object. Brown thought the object might be a gun. Brown ordered Gonzales to get down on the ground again. Gonzales immediately advanced and attacked Brown with the object. . . Brown fired his handgun approximately 5 times, into Gonzales's chest area, to stop Gonzales from stabbing him." (Doc. 146-13 at 3).

[6]     Plaintiff does not cite any evidence in support of her argument that Brown knew he was dealing with an "unstable, dangerous, and unpredictable" person. It appears that she is referring to statements in Brown's summary judgment motion, which are likewise not supported by record citation. (*See* Doc. 127 at 19 [referring to Gonzales as "intoxicated and unstable . . ., making his actions unpredictable and dangerous."]). The defendant's claims that Gonzales was "intoxicated" were premised upon the fact that "Leading Fox, Jr. would confirm that Gonzales had been drinking vodka earlier that day and was 'buzzed' from drinking" (*see id.* at 7, ¶ 4) and that a post-mortem toxicology report showed that Gonzales had a blood alcohol level of .22 (*id.* at ¶ 5). The underlying evidence (Leading Fox Jr.'s post-shooting statement to the OSBI and the post-mortem toxicology report) does not in any way relate to the reasonableness of the officers' actions prior to and during the shooting. The excessive force analysis examines the totality of the circumstances surrounding the officers' conduct immediately before and at the time of the use of force and not what they may have learned afterward from post-mortem interviews or toxicology reports.

the manner in which the officers approached the man, who was sitting in his car. 119 F.3d at 839-41. There was evidence that officers immediately ran to the car, screaming and reaching into the window to pry the gun from the man's hand. *Id.* at 841. Those actions caused a struggle, during which the man apparently pointed his gun at officers, who then shot him. *Id.* at 839. The court in *Allen* determined that a reasonable jury could find a violation of the Fourth Amendment under those circumstances. *Id.* at 841.

Plaintiff's argument that the defendants recklessly created the need to use deadly force in this case is not supported by the record. While it is appropriate to consider whether officers acted recklessly during a seizure, unreasonably creating the need to use force, "[t]he conduct of the officers before a suspect threatens force is relevant only if it is 'immediately connected' to the threat of force." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1320 (10th Cir. 2009) (quoting *Medina*, 252 F.3d at 1132). "Additionally, the officers' conduct is only actionable if it rises to the level of recklessness." *Id.* (citations omitted). "Mere negligent actions precipitating a confrontation would not, of course, be actionable under § 1983." *Id.* (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 & n.7 (10th Cir. 1995)). "The primary focus of [the] inquiry, therefore, remains on whether the officer was in danger at the exact moment of the threat of force." *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001).

Plaintiff has presented no evidence upon which a reasonable jury could find that the officers acted recklessly in their search of the abandoned nursing home or that Brown acted recklessly when he encountered Gonzales in the kitchen pantry. The officers' decision to look for Gonzales – who was a suspect in a second-degree burglary who had fled and was seen going into the nursing home – was not "immediately connected to" Gonzales's subsequent threat of force. *See Thomson*, 584 F.3d at 1320. Brown's action in finding Gonzales hiding in the pantry was the

event that was immediately connected to Gonzales's threat of force and physical attack with a weapon. There is no evidence from which a reasonable jury could find that locating him in the pantry was reckless under the circumstances. Gonzales immediately threatened and attacked Brown with a weapon. Other than suggesting that the officers should not have searched for Gonzales at all, the plaintiff does not explain what Brown should have done when Gonzales refused to comply with his commands and then produced a weapon and attacked him.

Unlike in *Allen*, there is no evidence here that Brown was aggressively approaching a suicidal person whom he knew to be armed and intent on self-harm. *Allen* is thus distinguishable on its facts.[7] Many courts in this circuit have declined to apply the general pronouncements from *Allen* to factually-dissimilar cases. *See, e.g.*, *Clark v. Colbert*, 895 F.3d 1258, 1264 (10th Cir. 2018); *Estate of Ronquillo v. City and County of Denver*, 720 F. App'x 434, 441 (10th Cir. 2017); *In re Estate of Bleck v. Churchill*, 643 F. App'x 754, 756-57 (10th Cir. 2016); *Thomson*, 584 F.3d at 1320-21; *Medina*, 252 F.3d at 1132-33; *Garrison v. Polisar*, 2000 WL 1140256, *3 (10th Cir.

---

[7]      The Tenth Circuit recently cited *Allen* in affirming a district court's denial of summary judgment. *See Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019). The facts in *Ceballos* are likewise distinguishable from this case. In *Ceballos*, a police officer shot Mr. Ceballos to death in the street in front of the Ceballos's home within one minute of arriving to respond to a report by Ceballos's wife that her husband was in the driveway with a baseball bat, acting crazy, drunk, and probably on drugs. When officers arrived, Ceballos was in his driveway, and officers knew that his wife and child were safe down the street, and there were no other persons nearby. An officer shot and killed the emotionally distraught Ceballos within a minute of arriving on scene, after approaching Ceballos quickly and screaming at him to drop the bat, and refusing to give ground as Ceballos approached the officers. The officer was between 12 and 20 feet from Ceballos when he shot the bat-wielding man. Unlike the circumstances in *Ceballos* and *Allen*, the evidence in this case undisputedly establishes that Officer Brown only shot Gonzales *after* Gonzales attacked and cut Brown on the face and neck. In addition, unlike the original radio reports in *Allen* and *Ceballos*, the radio call in this case did not mention a suicidal, mentally disturbed, or drunk subject, but merely reported a suspected burglary. These crucial distinctions render *Ceballos* and *Allen* inapplicable here.

Aug. 11, 2000) (unpublished); *Myers v. Okla. County Bd. Of County Commrs.*, 151 F.3d 1313, 1320 (10th Cir. 1998).

In this case, Gonzales not only threatened Officer Brown, he actually attacked him and cut his face and neck. Under the undisputed evidence and totality of the circumstances, Brown's use of deadly force was objectively reasonable. Thus, Brown did not violate the Fourth Amendment.

### b.    Second Prong: Cleary Established Law

In analyzing whether the federal right was clearly established at the time of the violation, "'the salient question . . . is whether the state of the law' at the time of [the] incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan*, 572 U.S. at 656 (quoting *Hope*, 536 U.S. at 741). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela*, 138 S. Ct. at 1152 (quoting *Brosseau*, 543 U.S. at 198). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* at 1153 (quoting *Mullenix v. Luna*, 577 U.S. __, __, 136 S. Ct. 305, 308-09 (2015)). "Precedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful.'" *Id.* (citation omitted). "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela*, 138 S. Ct. at 1152 (quoting *Mullenix*, 136 S. Ct. at 308).

The courts are "not to define clearly established law at a high level of generality," although "a case directly on point" is not required so long as "existing precedent [has] placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011); *see also Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741); *White v. Pauly*, __ U.S. __, 137 S. Ct. 548, 551 (2017); *Kisela*, 138 S. Ct. at 1152. A constitutional right is clearly established where a Tenth Circuit or Supreme Court precedent is on point such that the unlawfulness of the questioned conduct was apparent to the officer at the time of the use of force. *See Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017). "[A] right is clearly established when a precedent involves 'materially similar conduct' or applies with 'obvious clarity' to the conduct at issue." *Id.* (quoting *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964-65 (10th Cir. 2016)). Thus, officers are entitled to qualified immunity "absent a precedent that 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153.

Plaintiff has not met her burden to show that Brown's conduct violated the Fourth Amendment under law that was clearly established on May 1, 2010. Indeed, the plaintiff's response to Brown's summary judgment motion does not contain *any* "clearly established law" analysis. (*See* Doc. 146 at 16 [mentioning "clearly established" rights for the first time in the Conclusion of her brief]). Plaintiff cites only general legal statements and has not identified any legal authority that is on-point or precedent that has placed the constitutional question beyond debate. Plaintiff cited *Allen* without any analysis or comparison of the evidence in this case to the facts in *Allen*. As noted above, the circumstances in *Allen* are factually distinguishable from this case and thus would not have put Officer Brown on notice that he could not search the nursing home for a burglary suspect or that he could not use deadly force when he located the suspect and the suspect attacked him with a weapon.

Officer Brown is entitled to qualified immunity due to the plaintiff's failure to satisfy her burden to establish that Brown's conduct violated the Fourth Amendment or that, at the time of the shooting, clearly established law put Brown on notice that his conduct violated the Constitution.  Accordingly, Brown's motion for summary judgment will be granted.

### 2. Officer Leading Fox

Plaintiff presents mostly the same arguments as to Officer Leading Fox as she asserts in her response to Officer Brown's summary judgment motion.  Because the plaintiff has presented no evidence to dispute that Brown shot Gonzales and that Leading Fox was in another area of the nursing home at the time of the shooting, plaintiff's arguments as to Leading Fox are even weaker.  While plaintiff maintains that she disputes that Leading Fox was not present, she has not presented a single piece of evidence to support her argument.

In an effort to salvage a claim against Leading Fox, plaintiff asserts that, even if Leading Fox was not a direct participant in the shooting, he nevertheless failed to intervene to prevent an excessive use of force by Brown and may therefore be held liable.  (Doc. 147 at 16).  As noted above, the facts do not establish that Brown used excessive force.  If no excessive force was used, Leading Fox cannot be held liable for failing to intervene.  *See Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) ("[w]e are unaware of any failure to intervene case in which this court has reversed either a grant of summary judgment or qualified immunity to a government actor without first finding a genuine issue of material fact as to an underlying constitutional violation.").

Moreover, there is no evidence that Leading Fox was in the same room or observed the shooting, other than hearing the shots after they were fired in a separate part of the nursing home.  "In order to be liable for failure to intervene, the officers must have 'observe[d] or ha[d] reason to know' of a constitutional violation and have had a 'realistic opportunity to intervene.'" *Id.* (quoting

*Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008)). As there is no evidence that Leading Fox was involved in the use of deadly force or the seizure of Mr. Gonzales, plaintiff cannot show that Leading Fox violated the Fourth Amendment by failing to intervene. *See Brooks*, 614 F.3d at 1224-25; *Jones*, 809 F.3d at 576 ("[w]ithout either an unlawful seizure or an excessive use of force, Plaintiff's claim . . . for a failure to intervene in the violation of constitutional rights also fails.").

Plaintiff also has not presented any case authority that is on point or that bears any resemblance to the facts of this case as they relate to Leading Fox. She has cited no case that existed prior to the events in 2010 that would put Leading Fox on notice that his actions were in violation of the Constitution.

The plaintiff has not established that Officer Leading Fox violated Gonzales's Fourth Amendment rights or that any such rights were clearly established. Accordingly, Leading Fox is entitled to qualified immunity, and his summary judgment motion will be granted.

## C. Claims Against the City

As the plaintiff has conceded her wrongful death claim against the City of Pawnee under the OGTCA, the only remaining claim against the City is plaintiff's claim under § 1983. Her claim against the City is based on her allegation that the City failed to properly train Brown. A municipality may not be held liable under § 1983 solely because its employee inflicted injury; municipal liability cannot be found by application of the theory of *respondeat superior*. *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). "[L]ocal governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)).

To hold a municipality liable under § 1983, a plaintiff must prove (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation"). *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694 (citations omitted). The requirement of a policy or custom distinguishes the "acts of the municipality from acts of employees of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479.

With respect to plaintiff's failure to train theory, the Supreme Court has reiterated that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. A municipality may only be liable where "the need for more or different training is so obvious, and the inadequacy [in training] so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390.

The Supreme Court has recognized "limited circumstances in which an allegation of a 'failure to train' can be the basis for [§ 1983 municipal] liability." *Canton*, 489 U.S. at 387. "The touchstones of this inquiry, therefore, are [1] the risk inadequate training poses and [2] the city's awareness of that risk." *Brown v. Gray*, 227 F.3d 1278, 1288-89 (10th Cir. 2000). In *Connick*, the Supreme Court further elaborated on the deliberate indifference required to impose municipal liability under § 1983 for a failure to train:

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's "policy of inaction" in light

of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities. . . ."

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference'- necessary to trigger municipal liability." Without notice in a particular respect, decision-makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

563 U.S. at 61-62 (internal citations and quotations omitted). The Supreme Court also noted that it had not foreclosed "the possibility that the unconstitutional consequences of failing to train could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations," but reiterated that such liability is only available in a "rare" case involving a "narrow range of circumstances." *Id.* at 63-64 (quoting *Bryan County v. Brown*, 520 U.S. 397, 409 (1997)); *see also id.* at 72 (Scalia, J., concurring) (characterizing such claims as "rare").

The plaintiff cannot meet the *Monell* requirements. Because no reasonable jury could find that the individual officers violated Gonzales's Fourth Amendment rights, the plaintiff's claim against the City fails. *See, e.g., Hinton v. City of Elwood, Kan.*, 997 F.2d 774, (10th Cir. 1993) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers"); *Camuglia v. City of Albuquerque*, 448 F.3d 1214, (10th Cir. 2006) (determining City was also entitled to summary judgment where the court determined that there had been no underlying constitutional violation).

Plaintiff has also failed to identify a specific training deficiency or a pattern of constitutional violations by untrained City employees in similar situations. She again references

the description in Brown's motion that Gonzales was intoxicated, unstable, unpredictable, and dangerous. In that statement, Brown's counsel seemingly wished to assert that Brown had knowledge that he was dealing with an intoxicated individual whose actions would be unpredictable, whereas the plaintiff hopes to use the assertion to further her claim that there was some deficiency in the City's training to handle such suspects. (*See* Doc. 146 at 10-11). However, as previously noted (*see* fn. 6 above), there is no *evidence* in the record that Brown was aware *before* the shooting that Gonzales was mentally unstable or intoxicated. In any event, the plaintiff has not presented any evidence – e.g. depositions or discovery responses of Brown, Leading Fox, or any City official – to establish that Brown or Leading Fox did not receive training regarding the handling of such suspects. The City is thus entitled to summary judgment.

### D.     Plaintiff's State Law Claims Against Brown and Leading Fox

As noted, the plaintiff conceded her state law wrongful death claims as to the City of Pawnee, Herb Adson, and Officer Brown in his official capacity. Plaintiff indicates that she maintains her wrongful death claims against Officers Brown and Leading Fox individually. Because the Court has determined summary judgment should be granted on some of plaintiff's state law wrongful death claims, the Court will exercise supplemental jurisdiction over the remaining wrongful death claims against Brown and Leading Fox and will not exercise its discretionary authority to decline such jurisdiction. *See* 28 U.S.C. § 1367.

In his summary judgment motion, Brown cites authority and provides argument that he is immune from tort liability under the OGTCA because he was acting in the scope of employment. (Doc. 127 at 24). Under the OGTCA, individual defendants are not liable for torts committed within the scope of their employment. The OGTCA precludes tort actions against "an employee of the state or political subdivision acting within the scope of his employment." *Okla. Stat.* tit. 51,

§ 163(C); *see also id.*, §§ 152.1(A), (B), 153(A), (B) (employees of state and political subdivisions acting in scope of employment are immune from tort liability). "'Scope of employment' means performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority. . . ." *Okla. Stat.* tit. 51, § 152(12). Thus, individual government employees are immunized from tort liability for actions taken while acting within the scope of employment. *See id.* § 163(C); *Speight v. Presley*, 203 P.3d 173, 179 (Okla. 2008); *Martin v. Johnson*, 975 P.2d 889, 895 (Okla. 1998); *Nelson v. Pollay*, 916 P.2d 1369, 1373 (Okla. 1996).

In response to Brown's motion, plaintiff merely argues, without analysis or supporting authority, that "Officers Brown and Leading Fox, Sr. acted <u>outside</u> the scope of their employment, [and] the GTCA does not apply." (Doc. 146). However, she has provided no evidence or analysis to support that conclusory argument. It is undisputed that Brown was on duty during the events at issue in this case. Plaintiff has not provided any evidence upon which a reasonable jury could find that Officer Brown did not act in good faith within the duties of his office or employment or completing tasks lawfully assigned by a competent authority. He is entitled to summary judgment on the wrongful death claim.

Officer Leading Fox moves for summary judgment on the wrongful death claim because he was not involved in the shooting of Mr. Gonzales, such that he cannot be found to have caused his death. *See Okla. Stat.* tit. 12, § 1053(A) ("When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action against the latter."). In response to Officer Leading Fox's motion for summary judgment, the plaintiff merely states that she disputes the evidence that Leading Fox was not in the room and did not

witness the shooting of Mr. Gonzales. (Doc. 147 at 17). She has presented no evidence, however, to dispute the evidence on that point, as the Court has previously explained.

There are no genuine disputes of material facts, and Officers Leading Fox and Brown are entitled to judgment as a matter of law on the plaintiff's wrongful death claims against them.

## IV.  Conclusion

For the foregoing reasons, the defendants' Motions for Summary Judgment (Doc. 127, 128) are **granted**.  A separate Judgment will be entered forthwith.

**SO ORDERED** on this 24th day of April, 2019.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT